**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

```
_____
                                    )
Metropolitan Life Insurance Company, )
                                    )
            Plaintiff,              )
                                    )   Civil Action
       v.                           )   No. 16-11782-PBS
                                    )
Eric A. Beard,                      )
                                    )
            Defendant.              )
_____)
```

**MEMORANDUM AND ORDER**

July 10, 2018

Saris, C.J.

**INTRODUCTION**

Plaintiff Metropolitan Life Insurance Company ("MetLife") brings this action against Defendant Eric A. Beard to recover benefits paid to him as the son and sole beneficiary of decedent Paul K. Beard, who maintained life insurance under the Federal Employees' Group Life Insurance Act ("FEGLIA"), 5 U.S.C. §§ 8701-16, during his employment with the United States Postal Service. MetLife asserts jurisdiction pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 8715, and federal common law. The complaint

1

alleges a violation of FEGLIA (Count I); breach of contract (Count II); unjust enrichment (Count III); restitution (Count IV); and conversion (Count V). MetLife has moved for summary judgment on its equitable claim of unjust enrichment. After hearing and a review of the record, the Court **DENIES** the motion for summary judgment (Dkt. No. 21) on the ground that there are disputed factual issues as to the authenticity of the signature and the capacity of the deceased, who was an alcoholic.

## I.   BACKGROUND

### A. FEGLIA

FEGLIA provides a "low-cost group life insurance program for Federal employees," including United States Postal Service employees. H.R. Rep. No. 2579, 83d Cong., 2d Sess., 1 (1954). The United States Office of Personnel Management ("OPM"), which has the authority to administer and regulate the benefits under FEGLIA, purchases master policies from private life insurance companies such as MetLife. 5 U.S.C. § 8709.

FEGLIA provides two options: Basic and Optional Coverage. There are three types of Optional Coverage. Option A is standard optional insurance which is $10,000. 5 C.F.R. § 870.205(a). Option B "comes in 1, 2, 3, 4 or 5 multiples of an employee's annual pay (after the pay has been rounded to the next higher thousand, if not already an even thousand)." 5 C.F.R. §

870.205(b)(1). Option C is family optional insurance. 5 C.F.R. § 870.201(b).

Most federal employees are automatically enrolled in Basic Insurance unless they specifically elect for Optional coverage. Generally, both Basic and Optional insurance end "on the date the employee separates from service, subject to a 31-day extension of coverage." 5 C.F.R. § 870.601. Under certain circumstances, employees may choose to retain their Basic and Optional insurance into retirement. 5 C.F.R. § 870.701. An eligible employee with Option B or C has essentially three choices upon retirement: (1) to cancel coverage entirely; (2) to retain and pay for full coverage; and (3) "Full Reduction," which means that the employee starts with the full value of her coverage, but the value reduces by two percent per month for 50 months beginning in the second month of retirement. Dkt. No. 34-1 at 2. "Full Reduction" is free to the employee beginning the month after she turns 65. Dkt. No. 34-1 at 2; see also 5 C.F.R. § 870.705(c)(1).

If the employee fails to make a selection or fill out form SF 2818, the regulatory scheme contains default selections: Basic Insurance at 75% reduction, continuing Option A coverage (which reduces automatically), and Full Reduction for all eligible multiples of Option B and C. See Dkt. No. 34-1 at 3 ("**What if I don't make a choice for one or more coverages or I**

3

**don't file this form at all?** Then, if you are eligible to continue the insurance in retirement, you will have the default selection(s) **. . . .** For Options B and C, that means Full Reduction for all multiples you are eligible to have in retirement."); 5 C.F.R. § 870.701(c); 5 C.F.R. § 870.705(b)(1)(iii) ("Failure to make an election for Option B or for Option C will be considered to be an election of Full Reduction for all multiples of that Option.").

### B. Decedent Paul Beard

The facts below are undisputed except where otherwise stated.

Paul K. Beard was an employee of the United States Postal Service until his retirement on October 1, 2015. During employment his life insurance coverage included $62,000 in Basic insurance, $10,000 in Option A insurance, and $300,000 in Option B insurance. In preparation for retirement and in accordance with the regulatory scheme implementing FEGLIA, Paul Beard allegedly submitted a "Continuation of Life Insurance Coverage" form ("September SF 2818") to OPM dated September 10, 2015. The September SF 2818 indicates that, upon retirement, Paul Beard wanted to continue his Basic insurance and his Option A insurance, but not his Option B insurance. Defendant disputes the validity of the signature on the September form and Mr.

Beard's mental competency to execute the form due to severe alcoholism.

During discovery, Defendant also produced a signed SF 2818 form dated August 28, 2015 ("August SF 2818"), but there is no evidence that this form was actually submitted to OPM. The August SF 2818 indicated that Paul Beard did not want to continue Option B or C into retirement, but stated that he wished to have both at Full Reduction.

On November 12, 2015, Paul Beard died. On November 25, 2015, OPM provided MetLife with a Certification of Insurance Status, incorrectly stating that because Paul Beard had died within the 31 days of his retirement, he maintained Basic, Option A, and Option B insurance. Eric Beard, Paul Beard's son and sole beneficiary, claimed the life insurance benefits, receiving $362,123.99 on December 7, 2015 ($62,000 in Basic Insurance, $300,000 in Option B insurance, and $123.99 in delayed settlement interest).[1]

On February 24, 2016, upon receipt of Paul Beard's death certificate, OPM notified MetLife of the error in its November 25th certification, namely that it had incorrectly reported the date of Mr. Beard's death and therefore erred in stating he was

---

[1] Plaintiff admits Defendant did not receive, but was entitled to, $10,000 in Option A coverage. It has adjusted the money it seeks to recover accordingly.

5

...
...

eligible for Option B coverage. OPM issued a new Certification of Insurance Status, this time including an attached death certificate, stating that the coverage rightfully included Basic and Option A insurance, but not the $300,000 paid in Option B. MetLife subsequently began attempting to recover the overpayment via letter and phone. Defendant claims to have not received any calls from MetLife.

## II. LEGAL STANDARD

### A. Summary Judgment Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To succeed on a motion for summary judgment, the moving party must demonstrate that there is an "absence of evidence to support the nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657, 661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). The burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue of material fact for trial. Quinones v. Buick, 436 F.3d 284, 289 (1st Cir. 2006). A genuine issue exists where the evidence is "sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). A material fact is "one that has the potential of

affecting the outcome of the case." <u>Calero-Cerezo v. U.S. Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-50 (1986)). "Not every genuine factual conflict, of course, necessitates a trial." <u>Id.</u> But rather, "[i]t is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared." <u>Parrilla-Burgos v. Hernandez-Rivera</u>, 108 F.3d 445, 448 (1st Cir. 1997).

## III. DISCUSSION

### A. Defenses

Defendant disputes MetLife's claims of overpayment on two separate grounds. First, he argues that MetLife has failed to prove the signature is genuine. Second, Defendant asserts that his father lacked legal capacity to execute the insurance form because chronic and severe alcoholism rendered him "incapable of understanding and deciding upon the terms of the contract."

MetLife contends it has a contractual right to rely on OPM's certifications, and has a duty to pay in accordance with those certifications. The contract states:

> The Contractor [MetLife] shall rely on all certifications by OPM and other Government Agencies issued to verify an Insured Person's eligibility, Insurance in Force, and Annual Rate of Basic Pay consistent with the terms of this Section. Any erroneous payments or liabilities incurred in reliance on such written statements shall constitute a valid charge against the contract. However, the Contractor

7

>shall follow the procedures in section 2.7, *Erroneous Payments*, to attempt to collect the erroneous payment.

Dkt. No. 34-3 at 3. The same section requires that the contractor "use reasonable diligence to ensure that the certification was properly completed," reject certifications "made in a manner not approved by OPM," and notify OPM if it suspects fraud. Id. Based on its contract with OPM, MetLife argues it was entitled to rely on OPM's certifications concerning Beard's eligibility because there was no basis to suspect fraud and no evidence that MetLife failed to use reasonable diligence. While MetLife is correct on this point, the contract between MetLife and OPM does not strip a beneficiary of defenses recognized under federal law. See 5 U.S.C. § 8715.

As a beneficiary, Eric A. Beard is challenging the validity of his deceased father's signature and his capacity to sign based on severe alcoholism. FEGLIA is silent as to challenges to determination of eligibility for benefits based on defenses such as forgery or mental incapacity. Courts typically rely on federal law in resolving disputes about benefits due under FEGLIA. See, e.g., Bonner v. Metro. Life Ins. Co., 621 F.3d 530, 535 (6th Cir. 2010) ("[W]e now conclude that the definition of 'signature' found in 1 U.S.C. § 1 applies when assessing whether a beneficiary designation is 'signed' for

8

purposes of FEGLIA."); <u>Rice v. Office of Servicemembers' Grp. Life Ins.</u>, 260 F. 3d 1240, 1245 (10th Cir. 2001) (holding under analogous statute that "federal law governs the issues of mental capacity and undue influence."); <u>Metro. Life Ins. Co. v. Clark</u>, No. CV 07-304, 2008 WL 11338800, at *4 (D. Ariz. Aug. 22, 2008) ("Relevant authority seems to suggest that federal caselaw should be used to decide the kind of capacity required to designate a beneficiary."). Some courts have also looked to state law for guidance in resolving such disputes. <u>See</u>, <u>e.g.</u>, <u>Terry v. LaGrois</u>, 354 F.3d 527, 533 (6th Cir. 2004) (holding "we see no reason why the understanding of what constitutes a signature under the UCC and general contract law does not conform to or serve the end purposes for which Congress drafted FEGLIA").

    While FEGLIA does not address the issue of the burden of proof when authenticity of a signature is at issue, the UCC provides a helpful starting point. Under the UCC, a party must specifically deny a signature's authenticity in the pleadings. <u>See</u> U.C.C. § 3-308(a); <u>see also</u> U.C.C. § 3-308 cmt. 1 ("[T]he denial [of the authenticity of a signature] may be on information and belief, or it may be a denial of knowledge or information sufficient to form a belief."). If a signature is denied in the pleadings, "the burden of establishing validity is on the person claiming validity." U.C.C. § 3-308(a). However,

9

"the signature is presumed to be authentic and authorized unless the action is to enforce the liability of the purported signer and the signer is dead . . . at the time of trial." Id.

In his answer, Beard stated he was "without sufficient information so as to form a belief as to the truth or falsity of the allegation." Dkt. No. 6 ¶ 20. Under the UCC, this statement has the effect of a denial. See Fed. R. Civ. P. 8(b)(5). In response to the request for admission that the decedent signed the form, on September 12, 2017, Eric Beard stated, "After having made reasonable inquiry consisting of a review of materials in his possession [Eric Beard] is unable to either admit or deny this request." Dkt. No. 22-15. In his affidavit in response to the motion for summary judgment, on December 17, 2017, Defendant specifically contests the authenticity of the signature: "The signature MetLife purports as my father's on the 'Continuation of Life Insurance Coverage' Form does not appear to me to be the same as the signature on the earlier form and does not appear to be the same signature I had been familiar with prior to his death." Dkt. No. 31-1 ¶ 6; Beard Response Statement of Facts at 2, Dkt. No. 31.

MetLife insists that it is not plausible that someone else signed the form because no one else had the motive to forge the signature. But, Beard disputes that the signature is his father's, and a review of the two forms does not provide a

10

conclusive answer. Based on this record, the Court concludes there is a disputed issue of fact concerning the authenticity of the signature.

Beard also challenges the capacity of his father to sign the form because he was an alcoholic. In the Rule 16.1 joint statement, both parties agreed that there would be no expert testimony in the case. Dkt. No. 10. Then, after discovery closed, Defendant submitted an affidavit of Dr. Amos Zeidman, who was not the decedent's treating physician and had never met the decedent. Dr. Zeidman gave the opinion that "due to his chronic alcoholic impairment on or about September of 2015, Paul K. Beard, [sic] would have lacked the capacity to intelligently make a decision as to the selection of insurance benefits as set forth on the attached form." Dkt. No. 31-2 ¶ 5. MetLife moves to strike the expert affidavit because it was untimely disclosed after the end of discovery and after Defendant had taken the position that no expert discovery was needed. The Court agrees. Nonetheless, Beard timely raised the defense of lack of capacity in his summary judgment opposition based on his own observations, so there is a disputed issue of fact concerning capacity as well.

### B. The Default Provision

Without citation to any statute, regulation, or policy, MetLife argues that even if the decedent did not sign the form

or was incompetent, the "default" provision would be triggered, under which the retiring employee would have no Option B coverage in retirement. OPM instructs that for Option B, the default is "Full Reduction for all multiples you are eligible to have in retirement." Dkt. No. 34-1 at 2. "Full Reduction" does not mean the elimination of the benefit. Rather, it means that the retiring employee starts with the full value of his coverage, but the value reduces by two percent per month for 50 months beginning in the second month of retirement. Id. Accordingly, under the "default" option it appears that the decedent would have Option B coverage upon his retirement.

## ORDER

Plaintiff's motion for summary judgment is **DENIED** (Dkt. No. 21).

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge