UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                    )
Metropolitan Life Insurance         )
Company,                            )
                    Plaintiff,      )
                                    )    Civil Action
v.                                  )    No. 16-11782-PBS
                                    )
Eric A. Beard,                      )
                    Defendant.      )
_____)
```

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

February 7, 2019

Saris, C.J.

### INTRODUCTION

Plaintiff Metropolitan Life Insurance Company ("MetLife")
brings this action against pro se Defendant Eric A. Beard ("Eric
Beard")[1] to recover benefits mistakenly paid to him as the son
and sole beneficiary of decedent Paul K. Beard, who maintained
life insurance under the Federal Employees' Group Life Insurance
Act ("FEGLIA"), 5 U.S.C. §§ 8716, during his employment with the
United States Postal Service ("USPS"). After a bench trial, the
Court finds that Eric Beard was unjustly enriched.[2] Judgment
shall enter for MetLife.

---

[1] Eric Beard was initially represented by counsel who moved to withdraw prior
to trial because Beard did not pay him.

[2] In its Complaint, MetLife alleged a violation of FEGLIA (Count I); breach of
contract (Count II); unjust enrichment (Count III); restitution (Count IV);
and conversion (Count V). However, MetLife only pursued recovery under an
unjust enrichment theory in its briefing and proposed conclusions of law.

**FINDINGS OF FACT**

## I. Background

### A. FEGLIA

The United States Office of Personnel Management ("OPM"), which has the authority to administer and regulate the benefits under FEGLIA, purchases master policies from private life insurance companies such as MetLife. Pursuant to 5 U.S.C. § 8709, MetLife issued Group Policy No. 17000-G, known as the Federal Employees' Group Life Insurance Policy (the "FEGLI Policy") to OPM. The Office of Federal Employees' Group Life Insurance ("OFEGLI") is the administrative unit of MetLife charged with administering claims for FEGLI benefits.

There are two types of life insurance under the FEGLI program: Basic and Optional. For most federal employees, their Basic insurance amount is their annual rate of basic pay, rounded to the next higher thousand, plus $2,000. The cost of Basic insurance is shared between the insured individual and the employer/government.

There are three types of Optional insurance under the FEGLI program. Option A is standard optional insurance of $10,000. Option B is additional optional insurance and comes in 1, 2, 3, 4 or 5 multiples of an employee's annual pay (after the pay has

---

Accordingly, the Court proceeds with an unjust enrichment analysis and the other claims are waived.

2

been rounded to the next higher thousand, if not already an even thousand). Option C is family optional insurance. The federal employee pays the full cost of any and all Optional insurance selected.

Most federal employees are automatically enrolled in Basic insurance; Optional insurance must be specifically elected. Generally, both Basic and Optional insurance end on the date the employee separates from service, subject to a 31-day extension of coverage. Under certain circumstances, an employee may choose to retain his Basic and Optional insurance into retirement.

Prior to retirement, a federal employee with insurance coverage under FEGLI may choose to fill out a "Continuation of Life Insurance Coverage" form (SF 2818). The form provides for an employee to choose whether to continue Basic life insurance, and Options A, B, and/or C if the employee already has such coverage, into retirement. The form also provides for the employee to choose to continue coverage but at various reduced levels. For example, an eligible employee with Option B or C coverage may choose to discontinue coverage for retirement, retain and pay for full coverage, or choose to have the Optional insurance with "Full Reduction." "Full Reduction" means that the employee starts with the full value of his coverage, but the value reduces by two percent per month for 50 months beginning in the second month of retirement. There is a 31 day conversion

period starting from the day the employee retires. During this conversion period, the employee maintains the insurance he had immediately prior to retirement, before the new selections from the SF 2818 go into effect.

If an employee fails to fill out an SF 2818 prior to retirement, then there are default provisions. OPM instructs that for Option B, the default is Full Reduction for all multiples you are eligible to have in retirement. Again, "Full Reduction" does not mean the elimination of the benefit. Rather, it means that the retiring employee starts with the full value of his coverage, but the value reduces by two percent per month for 50 months beginning in the second month of retirement.

### B. MetLife's Claims Process

MetLife does not maintain or have access to a federal employee's paperwork until the employee, or former employee, deceases. At that point someone from the employee's family usually contacts OPM to report the death and OPM begins the death claim process. As part of that process, OPM sends MetLife a certification indicating what level of coverage the federal employee had at his time of death (Form RI 76-9), his designation of beneficiary, and a claim form usually completed by the person who reported the death (Form FE-6). It is standard practice for MetLife to receive a death certificate from OPM before a claim can be processed.

Pursuant to the FEGLI Standard Contract, MetLife is required to use "reasonable diligence to ensure that the certification was properly completed," and to "pay Benefits in accordance with the information on that certification." In doing so, MetLife must "rely on all certifications by OPM and other Government Agencies issued to verify an Insured Person's eligibility, Insurance in Force, and Annual Rate of Basic Pay." MetLife must also attempt to collect any erroneous payments made under the contract.

## II. **Decedent Paul K. Beard**

Paul K. Beard ("Paul Beard") was an employee of the USPS for 45 years. Paul Beard had life insurance coverage under the FEGLI program through his employment with the USPS. Immediately prior to his retirement on October 1, 2015, Paul Beard's life insurance coverage included $62,000 in Basic insurance (i.e., his $59,294 salary rounded to the next higher thousand and adding $2,000), Option A insurance in the standard amount of $10,000, and Option B insurance in the amount of $300,000 (i.e., five multiples of his salary rounded to the next higher thousand).

On August 20, 2015, Paul Beard submitted an "Application for Immediate Retirement" with the date of retirement listed as October 1, 2015. In preparation for retirement, on August 28, 2015 he filled out a "Continuation of Life Insurance Coverage"

form ("August SF 2818"). The form indicated that upon
retirement, Paul Beard had elected to continue Basic life
insurance at a 75% reduction and to continue Option A insurance.
It also indicated that Paul Beard did not want to continue
Option B or C into retirement, but stated that he wished to have
both at Full Reduction. This form was stamped as received by
human resources on September 1, 2015. After it was received,
someone wrote on the form, "If you are not keeping B or C then
just [check] no." The August SF 2818 was not part of the claim
file provided to MetLife.[3]

Paul Beard filled out, signed, and submitted a second SF
2818 on September 10, 2015 ("September SF 2818"). The September
SF 2818 indicated that, upon retirement, Paul Beard intended to
continue his Basic insurance and his Option A insurance, but not
his Option B or C insurance.[4]

On October 29, 2015, after retiring from the USPS, Paul
Beard signed a "Designation of Beneficiary" form (SF 2823)
designating his son, Eric Beard, his sole beneficiary to the
FEGLI benefits. Eric's wife Samantha Beard, and Samantha's

---

[3] At trial, when asked where he had found the August SF 2818 with the
additional writing on it, Eric Beard stated that it was in a box of his
father's papers.

[4] In his opposition to MetLife's motion for summary judgment, Eric Beard
disputed that the signature on the September 10, 2015 form was in fact his
father's signature. However, at trial Eric Beard conceded that he was no
longer disputing that his father had signed the September SF 2818. This
prevarication undermined the credibility of his testimony at trial.

sister, Sarah Mauro, witnessed the designation. He was competent and not intoxicated at the time he signed this form.

Paul Beard passed away from natural causes on November 12, 2015. He died more than 31 days after his retirement from the USPS on October 1, 2015. Thus, at his time of death he was insured for Basic life insurance of $62,000 and Option A life insurance of $10,000.

## III. **The Claim**

On November 23, 2015, Eric Beard, as Paul Beard's sole beneficiary, filed a claim for FEGLI benefits with MetLife. Eric Beard properly reported the date of death on that form (Form FE-6) as November 12, 2015. Shortly thereafter, on November 25, OPM Legal Administrative Specialist Katherine McCune provided MetLife with a Certification of Insurance Status form (Form RI 76-9) (the "November Certification"). In the November Certification, OPM incorrectly stated that Paul Beard's date of death was November 1, 2015, instead of November 12, 2015. The form mistakenly certified that Paul Beard had "died within 31 days of retirement" and thus had Basic life insurance at 75% reduction, Option A, and Option B coverage. OPM did not attach Paul Beard's death certificate to the November Certification.

Based on the November Certification, MetLife paid Eric Beard $362,123.99 on December 7, 2015. The payment consisted of $62,000 in Basic life insurance and $300,000 in Option B

insurance, plus a small amount of interest. MetLife overpaid Beard $300,000 in Option B coverage based on the inaccurate certification from OPM, and mistakenly failed to pay him an additional $10,000 he was entitled to in Option A coverage – accordingly, Beard was overpaid by $290,000. Beard had no knowledge at that time that he was overpaid.

On February 24, 2016, upon receipt of Paul Beard's death certificate, McCune at OPM emailed MetLife about the Paul Beard claim. The email stated, in part:

> [O]n the original paper cert [sic] for Paul K Beard . . . it was noted that the death was within 31 days of retirement, however, now with the receipt of the death certificate the date of death was reported incorrectly his date of death was 11/12/15 and not 11/01/2015 so this would change the amount of coverage he had at death. He would only have Basic at 75% and Option A.

On February 29, 2016, OPM issued a new Certification of Insurance Status (the "February Certification"), this time attaching Paul Beard's death certificate. The form certified that at his time of death, Paul Beard had Basic life insurance at 75% reduction and Option A insurance, but not Option B coverage. McCune also wrote on the February Certification, "[d]eath cert shows date of death 11/12/15 therefore death was not within 31 days of [his] retirement."

MetLife began attempting to recover the overpayment. On March 4, 2016, MetLife left a voicemail message on Eric Beard's

cell phone regarding the overpayment. After receiving no response from Beard, on March 7, 2016, MetLife's Complex Case Management Specialist Jessica Talbot sent Eric Beard a letter concerning the overpayment. The letter stated MetLife had paid Beard $362,123.99. The letter incorrectly stated that Beard's payment "should have been for only $62,021.23" which excluded the $10,000 Beard was rightly owed in Option A benefits. The letter asked Beard to send a check or money order for $300,102.76 to MetLife, when the overpayment was in fact $290,000 plus some amount of interest. Beard received the letter but did not call MetLife to investigate it further. On March 28, 2016, Jessica Talbot left another voicemail on Beard's cell phone concerning the overpayment. Beard received the calls from MetLife but ignored them.

As of mid-March 2016, Eric Beard had approximately $217,000 available in his Middlesex Savings Bank accounts. By September 2016, he had approximately $7,000 left in those accounts. Beard spent most of that money on ongoing renovations and improvements to his family home. To date, Eric Beard has not repaid MetLife for any of the benefits he received on December 7, 2015.

## IV. **Alcoholism and Capacity**

Eric Beard asserts that Paul Beard did not have the capacity to sign the SF 2818 on September 10, 2015 – in which he declined to continue Option B coverage - because of his severe

alcoholism. Paul Beard was a heavy drinker and began drinking more in the last few months before his death. On June 22, 2015, Paul Beard fell while at work. He was admitted to the hospital but fell again when he was discharged and had to be readmitted. When Eric saw Paul at the hospital he was "incoherent" and unable to recount how he arrived at the hospital. Eric also smelled alcohol on his father's breath.

Paul Beard was a loving grandfather and family man who was usually an active participant in family events. However, certain lapses caused concern in his son and daughter-in-law. For example, he was a "no-call/no-show" for the Fourth of July Parade in 2015, which was an event he had attended with his family for over ten years. Additionally, Paul failed to attend (or even ask about) his grandchildren's first day of school in the fall.

On August 20, 2015, Paul Beard saw a physician's assistant at Framingham Orthopedic Associates because of a knee injury. The medical provider described Paul as a "pleasant 63 year old male" who was "back at work doing full duty as a letter carrier" after his fall. Nothing in the August 20, 2015 medical records indicate that Paul was intoxicated at that doctor's appointment, or that a medical professional spoke to him about his drinking.[5]

_____

[5] In response to a question from the Court as to whether Paul Beard ever went to a doctor to help him address his alcoholism, Eric Beard stated that his

On September 11, 2015, the day after Paul Beard signed the September SF 2818, he was supposed to babysit Eric and Samantha's children so that the couple could celebrate their wedding anniversary. September 11 had traditionally been a day that Paul Beard "claimed" as his to babysit so that Eric and Samantha could go out. But on that day, Paul Beard arrived "unclean and hung over drunk," such that Eric and Samantha did not feel comfortable leaving their children alone with him.

Despite the apparent increase in drinking, there is no evidence Paul Beard was disciplined for alcohol use on the job, and there is no evidence that he was pressured to retire due to his drinking. Additionally, Eric Beard never attempted to obtain power of attorney for his father and did not seek to be appointed as his guardian. Neither party presented any evidence about Paul Beard's physical or mental condition on September 10, 2015 – the date he signed the September SF 2818. Significantly, his daughter-in-law, Samantha Beard, had no concerns about Paul Beard's competency to sign his designation of beneficiary form on October 29, 2015.

---

father had seen a psychiatrist. However, records from that visit were excluded from consideration because Defendant failed to timely produce them.

**CONCLUSIONS OF LAW**

## I. <u>Legal Capacity</u>

Eric Beard asserts that his father lacked the mental capacity to execute the September SF 2818 because chronic and severe alcoholism rendered Paul Beard incapable of understanding and deciding upon the terms of the contract. MetLife contends it has a contractual right to rely on OPM's certifications and has a duty to pay in accordance with those certifications. While MetLife is correct on this point, the contract between MetLife and OPM does not strip a beneficiary of defenses recognized under federal law. <u>Cf.</u> 5 U.S.C. § 8715; <u>see also</u> <u>Metro. Life Ins. Co. v. Clark</u>, No. CV 07-304, 2008 WL 11338800, at *4 (D. Ariz. Aug. 22, 2008) (allowing a challenge to the deceased's capacity to designate a beneficiary under FEGLIA).

### A. Applicable Law

#### 1. State or Federal Law

FEGLIA is silent on the issue of mental capacity. The Court must determine whether state or federal law is applied to determine if an insured individual has the legal capacity to sign an insurance form changing his coverage.[6]

---

[6] <u>Compare</u> <u>Leimbach v. Allen</u>, 976 F.2d 912, 917-19 (4th Cir. 1992) (applying state law to claim of undue influence); <u>Metro. Life Ins. Co. v. Leban</u>, No. CIV.A. 03-268, 2003 WL 22852211, at *2 (E.D. La. Nov. 28, 2003) (applying state law to fill gaps in FEGLIA on the issue of competency) <u>with</u> <u>Clark</u>, 2008 WL 11338800, at *4 (finding that relevant authority suggests "federal case law should be used to decide the kind of capacity required to designate a beneficiary" under FEGLIA).

12

While law in this area is sparse, courts have looked to case law interpreting the Servicemen's Group Life Insurance Act ("SGLIA"), 38 U.S.C. §§ 1965-1980A, for guidance. See Metro. Life Ins. Co. v. Zaldivar, 413 F.3d 119, 120 (1st Cir. 2005) ("Because the applicable language of FEGLIA and SGLIA are very similar, a case construing the latter . . . is highly persuasive, if not binding, in construing the former."). Under SGLIA "federal law governs the issues of mental capacity and undue influence." Rice v. Office of Servicemembers' Grp. Life Ins., 260 F.3d 1240, 1245 (10th Cir. 2001); see also Prudential Ins. Co. of Am. v. Athmer, 178 F.3d 473, 475 (7th Cir. 1999) (citations omitted) ("[W]hen a question relating to the interpretation and administration of an insurance policy issued under the authority of the servicemen's insurance statute arises that is not answered by the statute itself . . . the answer is to be supplied by federal common law."); Prudential Ins. Co. of Am. v. Mehlbrech, 878 F. Supp. 1382, 1386 (D. Or. 1995) ("Because the insurance policy at issue is a Servicemen's Group Life Insurance Policy, federal law governs the question of mental capacity."). Therefore, the Court will look to federal law for the standard.

2. Standard

Where "federal common law is silent or not fully formed with respect to an issue, it may be appropriate to borrow from

state law principles in fashioning the federal common law."
Forcier ex rel. Forcier v. Forcier, 406 F. Supp. 2d 132, 140 (D.
Mass. 2005), aff'd sub nom. Forcier v. Metro. Life Ins. Co., 469
F.3d 178 (1st Cir. 2006). In Massachusetts, the "capacity to
contract requires the ability to transact business, and more
specifically the ability to understand the nature and quality of
the transaction and to grasp its significance." Maimonides Sch.
v. Coles, 881 N.E.2d 778, 787–88 (Mass. App. Ct. 2008)
(quotations and citation omitted). "The inquiry as to the
capacity to contract focuses on a party's understanding or
conduct only at the time of the disputed transaction." Sparrow
v. Demonico, 960 N.E.2d 296, 303 (Mass. 2012). A contract may be
voidable due to incapacity where a party is either "incapable of
understanding and deciding upon the terms of the contract," id.
at 301, or where "by reason of mental illness or defect, [the
person] is unable to act in a reasonable manner in relation to
the transaction and the other party has reason to know of his
condition," id. at 302 (quoting Krasner v. Berk, 319 N.E.2d 897,
900 (Mass. 1974)). Additionally, the Supreme Judicial Court has
held that "medical evidence is necessary to establish that a
person lacked the capacity to contract due to the existence of a
mental condition." Sparrow, 960 N.E.2d at 304.

3. Burden of Proof

Under federal law, there is a "presumption of mental capacity in the insurance context," placing the burden of proof on Eric Beard. Rice, 260 F.3d at 1248. Similarly, under Massachusetts law, "[t]he burden is on the party seeking to void the contract to establish that the person was incapacitated at the time of the transaction." Sparrow, 960 N.E.2d at 301.

**B. Analysis**

Beard has not proven that Paul Beard's alcoholism incapacitated him at the time he signed the September SF 2818. While Paul Beard drank heavily, and saw a psychiatrist, there is no evidence that he was ever disciplined for his alcohol use or that it interfered with his work. Significantly, Samantha Beard, Eric's wife, indicated that Paul Beard was competent to sign the Designation of Beneficiary form in October 2015.

Paul Beard was confused about the SF 2818 form in August 2015, when he completed the form choosing inconsistent selections for Options B and C – selecting not to continue coverage, but then requesting "full reduction of all multiples." The forms, with many bureaucratic terms like "full reduction," are confusing even to lawyers. See Metro. Life Ins. Co. v. Beard, 321 F. Supp. 3d 181, 185–86 (D. Mass. 2018). However, OPM's guidance on the August SF 2818 clearly stated that, "[i]f you are not keeping B or C then just [check] no." Def. Ex. 29.

There is evidence that Paul Beard was intoxicated on September 11, 2015 – Eric and Samantha Beard's anniversary – but this is not sufficient to prove that he was incompetent the day before. I find Paul Beard had the mental capacity to sign the September SF 2818, electing to continue Basic and Option A insurance into retirement, but declining Option B and Option C coverage.

## II. <u>Unjust Enrichment</u>

Because the September SF 2818 is the controlling document, MetLife overpaid Eric Beard approximately $290,000.[7] Generally, "if an insurer pays a loss as a result of fraud or a mistake as to facts which would have been a sufficient defense in an action by the insured upon the policy, the money so paid may be recovered." <u>Maldonado-Viñas v. Nat'l W. Life Ins. Co.</u>, 862 F.3d 118, 122 (1st Cir. 2017) (quoting Steven Plitt et al., 16 Couch on Insurance § 226:50 (3d ed. 2017)). Recovery may be based on various causes of action. <u>See</u> <u>Ass'n Life Ins. Co. v. Jenkins</u>, 793 F. Supp. 161, 163-64 (M.D. Tenn. 1992). In this case, MetLife seeks restitution under an unjust enrichment theory, arguing that Eric Beard has been unjustly enriched by receiving $290,000 more in benefits than he was due under his father's insurance plan.

---

[7] MetLife paid Beard approximately $362,000 in benefits. He was owed $62,000 in Basic insurance coverage and $10,000 in Option A coverage, meaning MetLife overpaid Beard by approximately $290,000.

## A. Applicable Law

For the reasons stated above, because FEGLIA is a federal insurance plan, the Court will apply federal common law. In fashioning a federal common law rule of unjust enrichment, Courts have looked to state law. See Metro. Life Ins. Co. v. Faircloth, No. 7:12-CV-350, 2013 WL 12193433, at *1 (E.D.N.C. July 31, 2013) (looking to North Carolina law to analyze an unjust enrichment claim for overpayment of FEGLI benefits).

In Massachusetts, "a claim for unjust enrichment does not require consideration, but there must be unjust enrichment of one party and unjust detriment to another party." Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 57 (1st Cir.), decision clarified on denial of reh'g, 559 F.3d 1 (1st Cir. 2009) (quotation and citation omitted). A determination of unjust enrichment is one in which "[c]onsiderations of equity and morality play a large part." Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985) (quotation omitted).

With respect to restitution, it "is an equitable remedy by which a person who has been unjustly enriched at the expense of another is required to repay the injured party." Keller v. O'Brien, 683 N.E.2d 1026, 1029 (Mass. 1997). However, in Massachusetts, "[t]he fact that a person has benefitted from another is not of itself sufficient to require the other to make

17

restitution therefor. Restitution is appropriate only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for [him] to retain it." Id. (quotations and citations omitted). "The party seeking restitution has the burden of proving its entitlement thereto." Metro. Life Ins. Co. v. Cotter, 984 N.E.2d 835, 850 (Mass. 2013).

In an unjust enrichment analysis, one consideration is whether an innocent defendant has reasonably relied on the overpayment. See Restatement (Third) of Restitution and Unjust Enrichment § 65 (Am. Law. Inst. 2011) ("If receipt of a benefit has led a recipient without notice to change position in such manner that an obligation to make restitution of the original benefit would be inequitable to the recipient, the recipient's liability in restitution is to that extent reduced."). An expenditure of money is not itself a defense to liability in restitution. Id. cmt. c. To be entitled to a defense based on a change of position, the "recipient must demonstrate a causal relationship between receipt and expenditure: in other words, that the expenditure is one that would not have been made but for the payment or transfer for which the claimant seeks restitution." Id. While spending money is "normally not a change of position," expenditures "devoted to extraordinary consumption" have this effect. Id.; see also id. cmt. c,

illus. 9 ("Insurer pays a $5000 death benefit to Widow when the face amount of the policy is only $500. On discovery of the mistake, Insurer has a prima facie claim to restitution in the amount of $4500 (§ 6). Acting before she has notice of Insurer's mistake, Widow spends $3500 of the insurance money on an expensive funeral for her husband. Had it not been for Insurer's mistake, Widow would not have spent more than $500 on her husband's funeral. By the rule of this section, Widow is entitled to a defense with respect to her additional expenditure of $3000. Insurer is entitled to restitution from Widow in the amount of $1500.").

The Eighth Circuit in <u>Glover v. Metropolitan Life Insurance Company</u> affirmed a judgment against the second wife of the insured, who mistakenly received life insurance proceeds instead of the insured's first wife. 664 F.2d 1101, 1105 (8th Cir. 1981). The court analyzed the equities and looking to Missouri law found that Missouri courts, "when weighing the equities of a case, lay great emphasis on whether or not the payee has relied on retention of the payment received." <u>Id.</u> at 1104. The court required the second wife to repay the full amount because:

> [A] holding otherwise would grant [the second wife] a
> windfall. [The second wife] was not entitled to the
> proceeds of the insurance policy. Nor has she in any way
> relied upon it, so far as this record shows. The full

amount has been invested by [the second wife], and the fund
    remains intact.

Id.

    Massachusetts courts also consider whether the insured or
beneficiary reasonably relied upon payments in weighing whether
retention of the benefit would be unjust. See Cotter, 984 N.E.2d
at 852 (holding that a disability insurer was not entitled,
under a theory of unjust enrichment, to reimbursement of
disability benefit payments made since insurer did not show that
insured's retention of benefits would be unjust, including the
fact that the insured had relied on the payments for two years
before a determination was made); French King Realty Inc. v.
Interstate Fire & Cas. Co., 948 N.E.2d 1244, 1257 (Mass. App.
Ct. 2011) (holding that insurer was entitled to reimbursement of
an erroneously made advance payment where there was no coverage
under the terms of a fire insurance policy and the insured did
not change its position in detrimental reliance on the payment).
But see Metro. Life Ins. Co. v. Brown, No. CIV.A. 97-2002, 1998
WL 1084680, at *5 (W.D. Pa. Dec. 1, 1998) (holding under
Pennsylvania law that defendant, who was not at fault for the
FEGLI overpayment and who would have not spent the money
otherwise, was still required to pay back the full amount of
overpayment).

**B. Analysis**

MetLife has conferred a benefit on Eric Beard, namely $290,000 that he was not entitled to based on his father's insurance coverage at his time of death. The remaining question is whether Beard's retention of the overpayment would be unjust.

In weighing the equities, the Court considers that Eric Beard was not at fault in applying for death benefits as his claim form listed the correct date of death. OPM made a significant error in its November Certification which was based on the wrong date of death. MetLife failed to notice that the date of death on the Certification was inconsistent with the date of death on Eric Beard's claim form. But even if MetLife had caught the error, it would not have known whether Paul Beard died within 31 days of retirement because the forms MetLife received apparently did not list Paul Beard's date of retirement. The primary blame rests with OPM.

For a while, Eric Beard was an innocent recipient in that he had no knowledge of the overpayment until he was contacted by MetLife in March 2016. Considering the good relationship he had with his father, he had no reason to believe there was an overpayment. In reliance on the payment, he made extraordinary improvements to his home that he could not have otherwise afforded. However, despite being notified in March that the money was not rightfully his, Eric Beard continued to spend down

the proceeds throughout the summer of 2016. I do not credit his statements that he did not receive notification from MetLife. After he received notice of the mistake, he no longer could reasonably rely on the payment in renovating his home. Allowing him to retain the full benefit of the payment would be a windfall. Because unjust enrichment is an equitable doctrine, the Court determines that judgment should enter for MetLife in the approximate amount Eric Beard had remaining at the time he was notified of the overpayment which, according to bank records, was $217,000.

**ORDER**

The Court enters judgment in favor of MetLife in the amount of $217,000. MetLife's request for pre-judgment interest, attorney's fees, and costs is denied. MetLife shall submit a form of judgment within 10 days.

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge